ORVILLE E. AND IMAGENE L. DODD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dodd v. Commissioner
Docket No. 2787-71.
United States Tax Court
T.C. Memo 1976-138; 1976 Tax Ct. Memo LEXIS 270; 35 T.C.M. (CCH) 612; T.C.M. (RIA) 760138; April 29, 1976, Filed Orville E. Dodd, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief *271 Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were consolidated for trial but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron") and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' Federal income taxes for each of the years 1968 and 1969 in the respective amounts of $469.46 and $664.80. In an amendment to his answer to conform the pleadings to the proof, respondent seeks an increased *272 deficiency for 1968 and 1969, in the respective amounts of $525.57 and $679.39. The only issue for decision is whether all or any portion of the per diem payments received by petitioner Orville Dodd (hereinafter, "petitioner") in each of the years from his employers should be included in his gross income for the year received under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct an amount equal to all or any portion of the includible per diem as away-from-home traveling expenses under section 162(a)(2). Respondent's partial disallowances of petitioners' claimed medical expense deductions were based solely on the determined increases in petitioners' adjusted gross income consequent on the inclusion of the per diem payments in gross income. The propriety of such partial disallowances thus depends on the per diem/travel expense issue. FINDINGS OF FACT Petitioners, husband and wife, filed their 1968 and 1969 returns with the Internal Revenue Service Center servicing the State of Texas. They resided *273 at Meridian, Mississippi, at the time they filed their petition in this case. Petitioner worked as a member of a field team for Lockheed in 1968 and for a portion of 1969, and for Dynalectron for the remainder of 1969. Each of those companies had a contract with the United States Air Force, during each of the years 1968 and 1969, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors.The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, *274 of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the *275 purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected *276 after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called *277 upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) *278 it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders.While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well *279 as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, *280 and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner first entered field team work with a predecessor of Dynalectron in 1961. He was hired by Lockheed on August 5, 1965, and was assigned to Key Field at Meridian. Petitioner remained with Lockheed at Key Field until October 8, 1968. Effective the latter date he was assigned to the Columbus Air Force Base at Columbus, Mississippi, due to repair work on the runways at Key Field. Columbus is about 82 miles north of Meridian. Approximately two months later, on December 10, 1968, petitioner was assigned *281 by Lockheed back to Key Field where he remained until Lockheed was supplanted there by Dynalectron in the summer of 1969. Petitioner was then rehired by Dynalectron on August 5, 1969 and assigned to the Key Field program where he remained for the remainder of that year and until April 30, 1971, when Dynalectron transferred him to Orlando, Florida. Petitioner certified to both Lockheed and Dynalectron that his actual residence (fixed or permanent domicile) was at Route 1, Box 69, Stephenville, Texas. That is the address of G. L. Fagan, Mrs. Dodd's father. Petitioner does not live there and during the taxable years went there but once or twice a year on vacation. Petitioners have some of their furniture stored in a building on Mr. Fagan's property. Mr. Fagan forwards mail to petitioner if it is sent to the Stephenville address. Petitioner's parents also live in or near Stephenville, and petitioner has maintained his bank account with a Stephenville bank for many years. During the taxable years he purchased Texas license plates for his automobile. Petitioner owns no real property in Stephenville. However, he does assist in paying taxes on property owned by his parents in the *282 Fort Worth area. Mrs. Dodd and their three children lived with petitioner in Meridian throughout all the times that he was assigned at Key Field.The children attended school in Meridian. While petitioner was on the two-month assignment at Columbus, Mississippi, Mrs. Dodd and the children continued to reside in Meridian. Petitioner received per diem payments from Lockheed of $3,104 in 1968, and $1,944 in 1969. From Dynalectron, he received $1,224 in 1969. None of these amounts did he include in gross income on his return for either year. In his notice of deficiency, respondent included $2,537 per diem payments in petitioner's 1968 gross income and $3,105 in his gross income for 1969. By amendment to his answer, he has alleged that petitioner received additional per diem of $567 for 1968 and an additional $63 for 1969. OPINION It must first be determined whether the per diem payments received by petitioner from Lockheed in 1968 and 1969 and from Dynalectron in 1969 are includible in his gross income for those years. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The *283 Supreme Court has construed this "broad phraseology" to evince a Congressional intention to tax "all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized, and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's gross income for 1968 and 1969 the per diem payments he received in those years -- $3,104 in 1968 and $3,168 in 1969. Leo C. Cockrell, 38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504;Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) amounts equal to all or any part of the per diem payments received in each year, as expenses of travel while away from home in pursuit of his trade or business as an employee of Lockheed *284 and Dynalectron, Leo C. Cockrell, supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of *285 this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers, supra;Ronald D. Kroll,supra at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family *286 residence, the travel to his new place of employment and the additional living costs which he incurs there result, not from his employment, but from his decision not to move his residence. Rendell Owens,50 T.C. 577 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F.2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer, under all the circumstances, could reasonably have been expected to move his residence to the vicinity of his employment. Two points are thus presented: Were petitioner's assignments in 1968 and 1969 temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses?
Respondent concedes on brief that the Columbus, Mississippi, assignment and the Lockheed assignment at Key Field from the conclusion of the Columbus assignment until that company was supplanted by Dynalectron were temporary. However, he urges that the Lockheed assignment at Meridian in 1968 prior to the Columbus assignment and the Dynalectron assignment at Meridian from August *287 through the end of the year 1969 were indefinite. As to such 1968 Meridian assignment, when it is borne in mind that petitioner first arrived there in August 1965 and that by 1968 he had been there over two years, it is believed that his 1968 pre-Columbus assignment must be regarded as indefinite. That Meridian assignment could probably have been regarded as temporary at its inception and for perhaps a year or so thereafter; but when it persisted as it did, it has to be regarded as having become an indefinite one by 1968 and prior to the Columbus assignment. Considering the Dynalectron Meridian assignment from August 1969 to the end of that year, it is believed that, bearing in mind that Dynalectron was a new contractor at Meridian and the uncertainties as to the duration of its participation in the program at Key Field which inhered in the contractual arrangements between it and the Air Force, petitioner's Dynalectron assignment at Key Field as of December 31, 1969, must be regarded as only a temporary one. Thus, of the four assignments involved, the respondent concedes the second and third to be temporary, and it is believed that the fourth should also be so regarded; but the first *288 must be regarded as indefinite. The second point is whether petitioner maintained two places of abode during such four assignments and thereby incurred those additional and duplicate living expenses the mitigation of which the deduction under section 162(a)(2) is designed to achieve. During the three Key Field assignments, Mrs. Dodd and the children were with petitioner at Meridian. It was there that they ate, slept, worked, went to school -- in short, made their home. It was there, and there only, that petitioner incurred living expenses. Meridian must be regarded as his tax home during 1968 and 1969. His ties to Stephenville, Texas, where he incurred no living expenses and where he was physically present only on vacation, cannot be regarded as sufficient to make Stephenville his home for tax purposes. It follows that petitioner was not away from home and is not entitled to any deduction under section 162(a)(2) in respect of his three Meridian assignments. However, during the two-month temporary assignment in late 1968 at Columbus, Mississippi, petitioner did maintain a second abode for his family at Meridian, and he did thereby incur additional and duplicate living expenses. *289 He should, accordingly, be allowed a deduction under section 162(a)(2) of $567 (63 days at $9 per day), as away-from-home traveling expenses for 1968. * * * * *
In accordance with the foregoing, Decision will be entered under Rule 155.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.